## ROBERT J. MARGOLIN *v.* KLEBAN AND SAMOR, P.C., ET AL.
### (SC 17388)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

Argued April 12—officially released October 11, 2005

*Barbara A. Frederick*, with whom were *Kerry R. Callahan* and, on the brief, *Daniel R. Canavan*, for the appellants (named defendant et al.).

*Steven D. Ecker*, with whom was *Bradley K. Cooney*, for the appellee (plaintiff).

*Opinion*

VERTEFEUILLE, J. The defendants, the law firm of Kleban and Samor, P.C. (law firm), and Jonathan D. Elliot, an attorney with the law firm,[1] appeal[2] from the judgment of the trial court, rendered after a jury trial, awarding $1,040,183 in damages to the plaintiff, Robert J. Margolin. The defendants previously had represented the plaintiff in an action against a former business partner and four business entities (underlying action). In the present case, the plaintiff alleged legal malpractice because the defendants negligently had failed to obtain a prejudgment remedy in the underlying action,[3] thereby

[1] During trial, the trial court granted the motion for a directed verdict filed by the defendant Thomas E. Minogue, Jr., another attorney with the law firm, from which decision the plaintiff has not appealed. References herein to the defendants are to the law firm and Elliot only.

[2] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] A prejudgment remedy "means any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment . . . ." General Statutes § 52-278a (d). A prejudgment remedy is available upon a finding by the court that "there is probable cause that a

leaving the plaintiff unable to collect the default judgment that he ultimately obtained after changing attorneys.

The dispositive issues in this appeal are whether: (1) the evidence was sufficient to prove the existence and the amount of a default judgment in the underlying action; (2) the evidence was sufficient to prove that the default judgment was uncollectible; (3) the evidence was sufficient to prove that attachable assets were available to satisfy the default judgment had the defendants sought a prejudgment remedy; and (4) the amount of the verdict was excessive. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In May, 1991, the plaintiff entered into an employment contract with Professional Team Publications, Inc. (Team Publications), a sports publishing business that he and Peter C. Jaquith had established that year. The employment contract provided for the plaintiff to receive a salary of $1,011,356 over five years. The company struggled financially during its first year, causing the plaintiff to make three loans to Team Publications, including a loan of $50,000 on July 1, 1991. None of the loans was repaid. Similarly, the plaintiff did not receive any of the salary promised by the employment contract, or any reimbursement of other expenses guaranteed by the contract, including relocation expenses and out-of-pocket expenses for travel.

In 1992, Jaquith negotiated the sale of Team Publications' assets to another sports publishing company, Sports Media, Inc. (Sports Media). In the course of the negotiations, Jaquith improperly seized control of Team

judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . ." General Statutes § 52-278d (a) (1).

Publications and dismissed the plaintiff from its board of directors, in violation of the plaintiff's employment contract. The agreement that Jaquith negotiated with Sports Media did not require Sports Media to fulfill Team Publications' contractual obligations to the plaintiff, despite a term in the plaintiff's employment contract requiring any successor company to assume those obligations. In January, 1993, at a stockholders' meeting of a company related to Team Publications, Jaquith made defamatory statements concerning the plaintiff's performance with Team Publications, falsely accusing him of various improper and incompetent actions. Team Publications was forced into bankruptcy by debtors in February, 1993, and Sports Media entered bankruptcy in 1997.

In July, 1993, the defendants filed the underlying action on behalf of the plaintiff against Jaquith.[4] The complaint alleged in part that Jaquith's tortious interfer-

---

[4] The defendants in the underlying action included two businesses related to Team Publications, Career Information Services, Inc. (Career), a sister company, and Specialty Publishers, Inc. (Specialty), the parent company. The other defendants were Sports Media and Venture Partners, Ltd., a consulting firm hired by Jaquith. Team Publications was not a defendant because it was in bankruptcy when the action was filed. The claims against Career and Specialty included breach of contract and failure to repay the plaintiff's loans to Team Publications. The claims against Sports Media included breach of contract and fraud. The claims against Venture Partners, Ltd., included tortious interference with the employment contract, fraud and defamation. No money ever was recovered from Career, Specialty and Sports Media and the plaintiff settled his claims against Venture Partners, Ltd.

These defendants and claims in the underlying action are not relevant to the present appeal because, in the legal malpractice action, jury interrogatories were not requested by either party or given by the court and, thus, the verdict for the plaintiff was a general verdict. Under the general verdict rule, "if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall." (Internal quotation marks omitted.) *Kalams* v. *Giacchetto*, 268 Conn. 244, 254, 842 A.2d 1100 (2004). Because the plaintiff's claims, as they related to the defendants' failure to protect the plaintiff's right to recover against Jaquith, form a sufficient basis to sustain the jury's verdict, we need only consider those claims to resolve this appeal.

ence with the plaintiff's employment contract prevented the plaintiff from receiving his salary of $1,011,356 over five years, as well as other contractual benefits. The complaint further alleged that Jaquith fraudulently induced the plaintiff to make the July 1, 1991 loan of $50,000 to Team Publications, which was not repaid. The complaint also claimed that Jaquith made defamatory statements about the plaintiff that caused him injury. After the plaintiff terminated his relationship with the defendants and obtained new counsel, the underlying action culminated in a default judgment against Jaquith awarding the plaintiff the damages requested in the complaint. The judgment was rendered following a hearing in damages at which the plaintiff testified. The defendants did not seek or obtain a prejudgment remedy against Jaquith at any time during their representation of the plaintiff in the underlying action. After unsuccessful efforts to locate Jaquith, the plaintiff failed to collect any portion of the default judgment against him. The plaintiff later filed the malpractice action against the defendants that is the subject of the present appeal.[5] Additional facts will be set forth as necessary.

[5] The plaintiff's five count complaint alleged malpractice against the law firm, Elliot, and Thomas E. Minogue, Jr.; see footnote 1 of this opinion; breach of contract against the law firm, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., against all three defendants. The trial court granted the defendants' motion for a directed verdict as to all claims against Minogue and as to the CUTPA claims against the remaining defendants. Only the breach of contract and malpractice claims against the law firm and Elliot were submitted to the jury. The jury returned a verdict for the plaintiff without specifying on which counts of the complaint it was based. Because the jury's verdict can be sustained based on the malpractice counts, we need not consider the plaintiff's breach of contract claim. See *Kalams* v. *Giacchetto*, 268 Conn. 244, 254, 842 A.2d 1100 (2004) (verdict sustained under general verdict rule if any ground proper). We apply the general verdict rule because the trial court instructed the jury on the separate elements of the legal malpractice and breach of contract causes of action, as well as the distinct factual findings necessary to sustain a verdict on each count. Cf. *Alexandru* v. *Strong*, 81 Conn. App. 68, 79, 837 A.2d 875, cert. denied, 268 Conn. 906, 845

On appeal, the defendants raise numerous claims of evidentiary insufficiency and trial court impropriety. The defendants argue that the plaintiff should have been required to prove, in the present malpractice action, the existence and the amount of the default judgment in the underlying action, and that he should not have been permitted to present evidence concerning the merits of the underlying action. Alternatively, the defendants claim that, if the plaintiff properly was permitted to prove the merits of the underlying action, he failed to do so with sufficient evidence.[6]

The defendants also challenge the sufficiency of the plaintiff's proof of his right to recover in this malpractice action. The defendants contend that the plaintiff failed to prove that he was unable to collect the judgment against Jaquith. The defendants further claim that the plaintiff failed to prove that Jaquith possessed sufficient attachable assets from which the plaintiff would have been able to recover the damages awarded in

A.2d 406 (2004) (summary judgment rendered on breach of contract claim where legal malpractice allegations were merely restated in contract language); *Caffery* v. *Stillman*, 79 Conn. App. 192, 197–98, 829 A.2d 881 (2003) (same).

[6] The defendants also argue that the plaintiff should not have been permitted to present evidence concerning the claims of defamation and fraudulent inducement against Jaquith in the underlying action because the plaintiff did not pursue them in the hearing in damages. The defendants' brief does no more than make a bald assertion of this claim, without analysis. "We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004). Accordingly, we decline to consider this issue.

The defendants further claim that the court improperly refused to instruct the jury on Jaquith's assertion of a special defense based on privilege to the defamation claim in the underlying action. Once again, the defendants' brief merely asserts the claim without analysis and, therefore, we decline to consider the issue.

the underlying action had the defendants obtained a prejudgment remedy. Finally, the defendants argue that the amount of the verdict in the present case was excessive. We conclude that all of these claims are without merit.[7]

I

We consider first the defendants' claim that the plaintiff failed to prove sufficiently the existence and amount of the default judgment in the underlying action and that without such proof he may not prevail in the present case. We conclude that the evidence in support of the default judgment was sufficient to sustain the jury's verdict.

The following additional facts are necessary to the resolution of this issue. During the trial of the malpractice action, the plaintiff testified concerning the proceedings in the underlying action. He specifically testified that he was present for the hearing in damages that followed the trial court's issuance of a default against Jaquith. The plaintiff testified that he knew how the amount of the judgment against Jaquith was calculated, and stated that "[i]t was the exact amount that [the law firm] had filed in their complaint . . . plus interest." In the present case, the complaint in the underlying action previously had been admitted into evidence; it alleged that the plaintiff sought damages from Jaquith for the unpaid contractual salary amount of $1,011,356 and the unpaid loan of $50,000, in addition

[7] The defendants also raise numerous claims concerning the plaintiff's proof of his right to recover against Sports Media in the underlying action, including claims that the plaintiff's evidence was insufficient to prove by clear and convincing evidence that Sports Media engaged in fraud, that a prejudgment remedy was legally available against Sports Media under New York law and that Sports Media possessed sufficient attachable assets. We need not reach these claims because the jury reasonably could have based its verdict in the present case on the evidence concerning the plaintiff's right to recover against Jaquith in the underlying action.

to other unquantified damages, including damages for reimbursement of expenses under the contract and damages for Jaquith's defamation of the plaintiff at the stockholders' meeting.

The plaintiff's attorney then reviewed with him an affidavit of debt filed in conjunction with the hearing in damages and asked him if the total claims of $1,706,853.56 listed there were the same as the amount of the judgment entered against Jaquith. The defendants' attorney objected, arguing that the best evidence of the exact amount of the judgment would be the judgment itself. The plaintiff's attorney then withdrew his question. Later, when the plaintiff's attorney again asked the plaintiff about the exact amount of the default judgment against Jaquith, the defendants again objected. The trial court sustained the objection and indicated to the plaintiff's attorney that the exact amount of the judgment needed to be proved by written proof of the judgment. The plaintiff's attorney responded: "[I]f the court is requiring that we have written proof of the judgment then we are going to have to obtain a transcript of that and offer that into evidence before the trial is concluded." The plaintiff eventually concluded his case without presenting written proof of the judgment.

"We begin with the well established and rigorous standard for reviewing sufficiency of evidence claims. . . . We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion. . . . We apply this familiar and deferential scope of review, however, in light of

the equally familiar principle that the plaintiff[s] must produce sufficient evidence to remove the jury's function of examining inferences and finding facts from the realm of speculation." (Citations omitted; internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.,* 274 Conn. 33, 50, 873 A.2d 929 (2005).

"In general, the plaintiff in an attorney malpractice action must establish: (1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or omission; (3) causation; and (4) damages." *Mayer* v. *Biafore, Florek & O'Neill,* 245 Conn. 88, 92, 713 A.2d 1267 (1998).[8] The plaintiff here sought to establish causation and damages in part by proof that he had obtained a default judgment of a specific amount against Jaquith, upon which he could not recover because of the defendants' negligent failure to obtain a prejudgment remedy. The plaintiff's evidence of the default judgment consisted of his own testimony that he had obtained a judgment against Jaquith, the amount of which was "the exact amount that [the law firm] had filed in their complaint . . . plus interest." The complaint indicated that the plaintiff sought to recover from Jaquith the unpaid contractual salary amount of $1,011,356 and the unpaid loan of $50,000, in addition to other unquantified damages. Thus, the jury reasonably could have found, based on the plaintiff's testimony and the documentary evidence, that the plaintiff had obtained a default judgment against Jaquith for at least $1,061,356, an amount more than sufficient to support the jury's award of damages of $1,040,183 in the present legal malpractice case.

The defendants argue that the plaintiff failed to establish the amount of the judgment against Jaquith because he did not admit into evidence written proof of the

---

[8] The defendants do not challenge on appeal the plaintiff's proof of either the existence of an attorney-client relationship or the defendants' negligence.

judgment. Because the trial court ruled that the plaintiff should present written evidence as proof of the judgment amount and he failed to do so, the defendants argue, the plaintiff must be considered to have failed to prove that fact. We disagree.

The plaintiff's testimony that the damage award in the default action was the exact amount requested in the complaint, together with the admission of the complaint into evidence as a full exhibit, constituted sufficient evidence of the amount of the judgment. The failure to present a transcript of the hearing in damages or a certified copy of the judgment did not render the admitted evidence insufficient to sustain the jury's verdict. We will not find evidence insufficient merely because other evidence, not introduced, might have proved the fact in question with greater specificity. "[W]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003). In the present case, the plaintiff's evidence, viewed in the light most favorable to sustaining the jury's verdict, was sufficient to establish the amount of the default judgment against Jaquith.[9]

---

[9] In legal malpractice actions, the plaintiff typically proves that the defendant attorney's professional negligence caused injury to the plaintiff by presenting evidence of what would have happened in the underlying action had the defendant not been negligent. This traditional method of presenting the merits of the underlying action is often called the "case-within-a-case." 5 R. Mallen & J. Smith, Legal Malpractice (5th Ed. 2000) § 33.8, pp. 69–70. In the present case, in addition to presenting evidence of the existence and the amount of the default judgment against Jaquith, the plaintiff alternatively sought to prove that, if the underlying action had been tried, he would have prevailed on the merits and would have been entitled to damages. The defendants argue that the plaintiff should not have been permitted to prove causation or damages by the "case-within-a-case" method because of the existence of the default judgment.

## II

The defendants next argue that, even if the plaintiff proved his entitlement to damages against Jaquith in the underlying action, he did not provide sufficient evidence that the defendants' failure to obtain a prejudgment remedy rendered him unable to recover those damages.[10] On this point, the defendants claim, first, that the plaintiff's evidence was insufficient to prove that the default judgment was uncollectible, and, sec-

---

Because the plaintiff's evidence of the existence and amount of the default judgment was sufficient, we need not determine whether the plaintiff properly was permitted to litigate the underlying action as a supplement to his evidence concerning the default judgment. The default judgment constituted a sufficient basis for the jury's verdict and, if the trial court improperly allowed the plaintiff to prove the "case-within-a-case," that error was harmless.

Similarly, because the plaintiff sufficiently proved the existence and amount of the default judgment, we need not reach the defendants' challenges to the plaintiff's evidence concerning the merits of the underlying action. Therefore, we decline to consider the defendants' claims that the plaintiff failed to prove: (1) by clear and convincing evidence that Jaquith fraudulently had induced the plaintiff to make the July 1, 1991 loan of $50,000; (2) that Jaquith's interference with the plaintiff's employment contract was tortious; (3) that the plaintiff would have been paid his salary and repaid his loan but for Jaquith's interference; and (4) that the plaintiff suffered substantial harm as a result of Jaquith's defamatory statements.

[10] The defendants further claim that the plaintiff insufficiently proved that a prejudgment remedy was available legally because expert testimony was required to prove proximate causation and the plaintiff's expert witness failed to testify that the trial court would have granted a request for such a remedy in the underlying action. The defendants' brief argues this point in only three conclusory sentences and without substantive legal analysis. An additional one sentence statement of the legal proposition that expert testimony is required on proximate causation in a legal malpractice action is found in an earlier portion of the brief. For that proposition, the defendants cite two decisions of the Appellate Court, *Beecher* v. *Greaves*, 73 Conn. App. 561, 564, 808 A.2d 1143 (2002) (per curiam), and *Somma* v. *Gracey*, 15 Conn. App. 371, 374–75, 544 A.2d 668 (1988), neither of which contains substantive analysis of the issue. Because the defendants failed to provide meaningful analysis or to cite authoritative precedent, we decline to consider this issue. See *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004) (analysis required to avoid abandoning issue).

ond, that there was insufficient evidence to prove that Jaquith owned assets that were subject to attachment and sufficiently valuable to satisfy the default judgment. Specifically, the defendants claim that the plaintiff failed to prove that a Connecticut investment account owned by Jaquith was available for attachment and sufficient to satisfy the default judgment.[11] The defendants claim that the trial court improperly relied on the business records exception to the hearsay rule to admit into evidence a financial statement that showed the existence and value of the investment account and that the evidence failed to prove that the account contained sufficient value when the underlying action was filed to satisfy the subsequent default judgment. We disagree.

A

We first consider the claim that the plaintiff failed to prove that the judgment against Jaquith was uncollectible. The jury reasonably could have found the following additional facts, which are necessary to our resolution of this issue. After securing the default judgment, the plaintiff unsuccessfully attempted to locate Jaquith by contacting numerous individuals and companies with which Jaquith was associated. After divorcing Jaquith in June, 1995, his former wife, Sharon Lesk, sought to collect an unpaid debt from Jaquith. She was unable to find him or even determine whether he was alive, despite hiring private investigators and making numerous personal inquiries. Jaquith lost nearly all of his remaining assets in 1995 as a result of the divorce. In 1995 and 1996, Jaquith twice underwent unsuccessful treatment for drug and alcohol addiction. The trustee in the Team Publications bankruptcy action engaged

---

[11] The defendants also challenge the plaintiff's proof of the availability of Jaquith's other assets, including his Connecticut house. Because we conclude that the plaintiff sufficiently proved the availability of the investment account, and that the value of the account was sufficient to satisfy the default judgment, we need not reach these claims.

investigators who were unable to find Jaquith. Jaquith's attorneys in the underlying action moved to withdraw in July, 1997, because they had not been paid and did not know where to contact him.

We conclude that the plaintiff's evidence that Jaquith was impoverished and that multiple individuals with financial incentive to find him were unable to do so in 1996 and 1997, was sufficient to support an inference by the jury that the judgment against him was uncollectible. The default judgment was entered after Jaquith's unsuccessful treatment for substance abuse and after the loss of his assets in the divorce.[12] On the basis of this evidence, the jury reasonably could have found that the plaintiff was unable to collect the judgment against Jaquith in the underlying action.

B

We next consider the defendants' claim that the plaintiff's evidence was insufficient to prove that Jaquith possessed sufficient attachable assets to satisfy the default judgment. The defendants challenge the plaintiff's proof on the grounds that the trial court improperly admitted into evidence a financial statement showing the existence and value of the investment account and that the evidence failed to establish the value of the account at the time the underlying action was filed.

The following additional facts are necessary to our resolution of these issues. Jaquith owned an investment account in Connecticut worth $2.5 million as of June, 1992. The existence and value of the investment account was proven through the admission of a personal financial statement prepared by Jaquith in 1992 listing the

[12] Although the jury was not informed of the exact date of the hearing in damages in the underlying action, which was held on January 21, 1998, the jury reasonably could have inferred that the default judgment was entered soon after Jaquith's attorneys' motion to withdraw was granted on September 9, 1997.

account as an asset. The financial statement indicated that Jaquith possessed assets worth more than $20 million. Lesk testified that she and Jaquith prepared the financial statement in June, 1992, in order to qualify for a business loan in the ordinary course of business, that loan applications were made in the ordinary course of their business, that she maintained the document in the business office, and that it was a true and accurate representation of their financial assets as of June, 1992.

Additional evidence established that, between 1993 and 1995, Jaquith was forced to sell some of his assets prior to losing the remaining assets in the dissolution action in June, 1995. As a result of litigation with several printing companies to whom Jaquith had given personal guarantees on behalf of his businesses, Jaquith paid a judgment of an unspecified amount in 1993 and another debt sometime after that in connection with a separate lawsuit that was filed in 1993, paid another $100,000 in 1994, and lost ownership of a house in California by way of foreclosure in 1995. In 1994 and 1995, Jaquith took more than $843,500 out of a business he owned; in 1995, he was forced to sell shares of stock in Sports Media worth $381,500; and, in 1995, he sold one of his businesses for $500,000. The underlying action was brought by the defendants on behalf of the plaintiff in July, 1993.

1

The defendants claim that the trial court improperly admitted Jaquith's financial statement showing the existence of the $2.5 million investment account because the financial statement constituted hearsay and failed to satisfy the criteria for the business records exception to the hearsay doctrine. We disagree.

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . We will make every reasonable presumption in

favor of upholding the trial court's ruling, and only
upset it for a manifest abuse of discretion." (Internal
quotation marks omitted.) *State* v. *William C.*, 267
Conn. 686, 700–701, 841 A.2d 1144 (2004). "[General
Statutes §] 52-180[13] sets forth an exception to the eviden-
tiary rule otherwise barring admission of hearsay evi-
dence for business records that satisfy express criteria.
. . . [S]ee also Conn. Code Evid. § 8-4 (incorporating
§ 52-180). . . . The rationale for the exception derives
from the inherent trustworthiness of records on which
businesses rely to conduct their daily affairs." (Citations
omitted; internal quotation marks omitted.) *State* v.
*Christian*, 267 Conn. 710, 757–58, 841 A.2d 1158 (2004).

"To be admissible under the business record excep-
tion to the hearsay rule, a trial court judge must find
that the record satisfies each of the three conditions
set forth in . . . § 52-180. The court must determine,
before concluding that it is admissible, that the record
was made in the regular course of business, that it was
the regular course of such business to make such a
record, and that it was made at the time of the act
described in the report, or within a reasonable time
thereafter. . . . In applying the business records
exception . . . [§ 52-180] should be liberally interpre-
ted." (Internal quotation marks omitted.) Id., 758.

Jaquith's financial statement was admitted by the
court as a business record based on the undisputed
testimony of Lesk that she and Jaquith had prepared
the statement in June, 1992, to qualify for a business
loan in the ordinary course of business, that applica-

---

[13] General Statutes § 52-180 (a) provides: "Any writing or record, whether
in the form of an entry in a book or otherwise, made as a memorandum or
record of any act, transaction, occurrence or event, shall be admissible as
evidence of the act, transaction, occurrence or event, if the trial judge finds
that it was made in the regular course of any business, and that it was the
regular course of the business to make the writing or record at the time of the
act, transaction, occurrence or event or within a reasonable time thereafter."

tions for loans were made in the ordinary course of their business, that she maintained the document in the business office, and that it was a true and accurate representation of their assets as of June, 1992. The document thus satisfied the criteria for the business records exception.

The defendants further challenge the document, however, by arguing that it was admissible, if at all, only to prove the fact that Jaquith and Lesk had applied for a loan, and not to prove the truth of the information reported in the document. They base this argument on the language of § 52-180 (a), which provides that a business record "made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event . . . ."

Such a narrow reading of the statute would not comport with existing case law. Business records are routinely admitted under the business records exception for the truth of the business information reported therein because the documents bear an inherent trustworthiness as records on which businesses rely to conduct their daily affairs. See *State* v. *William C.*, supra, 267 Conn. 702. The use of the records has not been limited to establishing the fact of the transaction for which the documents were created. Rather, the records may be used to establish the truth of their contents. See, e.g., *State* v. *Kirsch*, 263 Conn. 390, 400–409, 820 A.2d 236 (2003) (blood test properly admitted under business records exception to prove blood alcohol level); *Calcano* v. *Calcano*, 257 Conn. 230, 241–42, 777 A.2d 633 (2001) (chiropractor's treatment notes properly admitted under business records exception to prove prior injury); *New England Savings Bank* v. *Bedford Realty Corp.*, 246 Conn. 594, 597–603, 717 A.2d 713 (1998) (loan documents should have been admitted under business records exception to show amount of

debt); cf. *Pagano* v. *Ippoliti*, 245 Conn. 640, 651, 716
A.2d 848 (1998) (meeting notes admissible as business
record but their description of statements made by
meeting participant constituted inadmissible second
level of hearsay). Indeed, if the business record only
proved that an act occurred, it would not constitute an
exception to the hearsay rule. See *State* v. *Watley*, 195
Conn. 485, 490, 488 A.2d 1245 (1985) (if conversation
admitted to show it took place, it is not hearsay). Thus,
the trial court acted within the scope of its discretion
and properly admitted Jaquith's financial statement as
evidence of his assets in June, 1992.

2

The defendants next challenge the evidentiary value
of the financial statement, arguing that the document
shows only the status and value of Jaquith's assets in
June, 1992, and does not prove that the assets were
available for attachment when the underlying action
was brought in July, 1993. We disagree.

The defendants argue that Lesk testified that Jaquith's
financial troubles required him to dispose of many of
his assets prior to the dissolution judgment in 1995,
when Lesk was awarded the couple's remaining assets.
Lesk's testimony concerning the sale of various assets,
however, did not indicate any dissipation of the invest-
ment account between June, 1992, when the financial
statement was prepared, and July, 1993, when the
underlying action was filed and a prejudgment remedy
could have been sought. Lesk did not testify that the
investment account was affected by any of these trans-
actions and, to the extent that her testimony established
that Jaquith was selling many of his assets, those sales
occurred primarily in 1994 and 1995, well after the
defendants filed the underlying action on the plaintiff's
behalf in July, 1993. Interpreting the evidence in the
light most favorable to sustaining the verdict, and

allowing for reasonable inferences drawn therefrom, the jury reasonably could have found that the investment account, which was worth $2.5 million in June, 1992, continued to have sufficient value in July, 1993, that, if attached, would have allowed the plaintiff to recover on the subsequent default judgment.

### III

Finally, the defendants claim that the amount of the verdict in the present case was excessive. We disagree.

The following additional facts are necessary to resolve this claim. In February, 1993, Team Publications was forced into bankruptcy. Both the plaintiff and Jaquith filed claims against the bankrupt estate. Among the estate's remaining assets were 500,000 shares of Sports Media stock. When, at the plaintiff's urging, the bankruptcy trustee counted the shares, he discovered that more than 300,000 of those shares were missing and he eventually learned that 109,000 of the shares had been sold for more than $300,000 by Jaquith for his personal benefit. During his presentation of the "case-within-a-case," the plaintiff presented evidence that the defendants' negligent representation of him resulted in the bankruptcy trustee's failure to recover this amount from Jaquith as well as the loss of other bankruptcy assets totaling $1.2 million.

"The law concerning excessive verdicts is well settled. The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. . . . The trial court's refusal to

set aside the verdict is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. . . . This is so because [f]rom the vantage point of the trial bench, a presiding judge can sense the atmosphere of a trial and can apprehend far better than we can, on the printed record, what factors, if any, could have improperly influenced the jury." (Internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 323, 852 A.2d 703 (2004).

The defendants' argument that the verdict was excessive rests upon their interpretation of the plaintiff's evidence concerning the amount of damages to which he would have been entitled if the underlying action had been tried. The defendants contend that, because Team Publications filed for bankruptcy, the plaintiff could expect to be compensated on his contract claims against Team Publications only from the bankrupt estate. Moreover, they claim, he received all that he was entitled to receive, except his share of the $300,000 taken by Jaquith and the $1.2 million reduction in the value of the bankruptcy estate from the defendants' alleged negligence. The defendants argue that the plaintiff's share of the bankruptcy estate was 11.5 percent and, thus, his share of these amounts would be no more than $139,000. The defendants argue, therefore, that the plaintiff's recovery on the employment contract should have been limited to this amount. The defendants further contend that his additional damages against Jaquith were limited to $50,000 for fraudulent inducement to make the July 1, 1991 loan and nominal damages on the defamation claim. Thus, the defendants argue that the plaintiff should not be entitled to recover damages in excess of $1 million because he would not have been able to recover that amount in the underlying action.

The defendants' argument focuses exclusively on the amount of damages to which the plaintiff would have

been entitled had the underlying action been tried. In other words, the defendants attack the sufficiency of the plaintiff's evidence in the malpractice action to prove his damages claim in the underlying action. Those damages were proved alternatively, however, by the plaintiff's evidence of the amount of the default judgment entered in the underlying action after the hearing in damages. The amount of damages that the plaintiff would have been able to prove in a contested trial on the merits of the underlying action is not dispositive on this issue because the plaintiff presented sufficient evidence to enable the jury to find that the amount of the default judgment in the underlying action was at least $1,061,356, and that the plaintiff was unable to recover on that default judgment because of the defendants' negligent failure to obtain a prejudgment remedy. Accordingly, the jury reasonably awarded the plaintiff damages in the amount of $1,040,183.

The judgment is affirmed.

In this opinion the other justices concurred.